CHESAPEAKE & O. R. CO. v. HENNESSEY.

(Circuit Court of Appeals, Sixth Circuit.  October 3, 1899.)

No. 665.

1. MASTER AND SERVANT—ASSUMED RISK—HANDLING DEFECTIVE CARS.
    A switchman employed by a railroad company in switch yards at the end of a division, where trains are inspected and defective cars taken out and placed on side tracks for repair or removal to the shops, and whose daily duty it is to couple and handle such defective cars, assumes the extra risk due to their defective condition, and which is necessarily incident to his employment.

2. SAME.
    Where it was a part of the regular duties of a switchman to handle defective and broken cars, which were taken from trains and placed upon special side tracks used for the purpose, the mere presence of a car on such tracks was notice to him that it was probably defective, which cast upon him the risk in handling it, and the duty of examining it for the particular defect, although sound cars, improperly loaded, were occasionally placed on the same tracks.

3. SAME—INSTRUCTING SERVANT—LIMITS OF MASTER'S DUTY.
    Where a servant has notice of the general risks and dangers of his employment, such as that many of the cars which he is required to handle as a switchman are defective, the master is not guilty of negligence in failing to notify him of each particular defect, as such duty, if required, is one necessarily devolving on fellow servants, for whose particular acts of negligence the master is not responsible.

In Error to the Circuit Court of the United States for the District of Kentucky.

James M. Hennessey was foreman of a switching crew employed in the yard of the Chesapeake & Ohio Railroad Company at Russell, Ky.  While engaged in making a coupling in the yard of the company, he sustained an injury.  This suit was brought to recover damages for the injury so sustained. Russell was the end of a division.  All cars passing there were inspected. For this purpose two inspectors were employed.  As many as six or eight hundred cars pass Russell each day.  When a car was found to be defective, it was marked on the sides "Shop."  This signified to the yard master that the car must not proceed, but must be taken out of the train, and placed on the shop or repair tracks.  These were two in number, and known as tracks "8 and 9," or "Shop" or "Repair" tracks.  These were spur tracks, and were entered only from the western end.  Each track held about 25 cars.  Cars, when placed on these shop tracks, were cut so that each car stood separated by two or three feet from every other car.  Cars, when placed on these tracks, were inspected by the foreman of repairs.  If the defect was one which could be repaired at Russell, it was repaired where it

stood.' If so seriously defective as to be more advantageously repaired at Huntington, which was near by and the location of the general shops of the company, it was chalked, "Huntington Shop," "Transfer." This meant that the car was to be forwarded to Huntington, as too defective for repair at Russell. The foreman of repairs determined whether the repair should be made at Russell or Huntington. It was the business of the switching crews to take all cars marked "Shop," or otherwise withdrawn from use, and place them on the shop tracks. It was likewise their duty to pull out from the shop tracks all cars which had been repaired, or which were to be sent to Huntington for repairs, and place all such cars upon proper tracks for forwarding. This was done under the general order and direction of the yard master. Cars which had been repaired were chalked by the foreman of repairs "O. K.," and were locally called "O. K.'d cars." A blue flag was placed upon the car at the western end of these shop tracks. This meant that repairs were going on, and that no engine or moving car was to come in contact with the cars on such tracks while the blue flag was up. Once a day, and sometimes oftener, this blue flag was taken down by direction of the yard master, and all cars O. K.'d or chalked for Huntington were pulled off by the switching crews, and placed on proper tracks to be carried to destination. Mixed in with O. K.'d cars would be cars not yet repaired. This necessitated the coupling of all the cars standing on the track, the pulling out and separation of cars to go on, and the "kicking back" of cars not yet repaired. There were two switching crews employed in this yard. Hennessey had been employed on one of these crews for about three years. At the time of his injury, he was foreman of one of the crews. All the switching necessary in the yard was done by these crews. This involved the making up of trains and the disintegration of such as had at Russell their terminus. It also involved the handling of all defective or improperly loaded cars, and the handling of the cars standing on the shop tracks for the purposes already mentioned. It was also the business of the inspectors to order out of trains all cars which appeared to be improperly loaded, and detain them to have loading readjusted. Improperly loaded cars were also placed on the shop tracks, when there was room, and their loading there corrected. There was some conflict in the evidence as to whether such improperly loaded cars were marked "Shop" or not. Hennessey was engaged in "pulling" the cars on repair track No. 9 at 4:15 p. m., January 30, 1897, when he was injured. The two cars at the rear or east end of that track were numbered, respectively, 10,845 and 14,694. The latter was the rear car, and had been O. K.'d. Car 10,845 was the next car, and was a flat car loaded with bridge stone. This car (No. 10,845) arrived in the yard at noon, January 28th, from a point west of Russell, and was destined to a point east of Russell. This car on the 29th was seen upon a track called the "Pit Track," which led only to a gravel bank. While on that track it was seen by Hennessey, though he was not nearer to it than 125 feet. He says that from where he saw it he could see that the stone with which it was loaded was projecting over one end some 2 or 2½ feet. That car, on the night of the 29th, was placed upon the shop track, where Hennessey next saw it just as he was about to couple it to the car next east, being the empty O. K.'d gondola car No. 14,694. Hennessey and another, by direction of the yard master, were coupling the whole train of cars standing on repair track No. 9, in order to get out the O. K.'d cars to be put in trains and forwarded. They began to couple from the west or front end of the track, and had coupled all but the last two cars. Hennessey passed down along the cars until he reached the gondola, when he placed a link in its drawhead, and stood waiting for the approach of car No. 10,845. It came toward him slowly. He saw, he says, that it was the car he had seen on the pit track the day before, and that its load projected over the east end. He stooped to avoid the projecting stone, and guide the link into the slot of its drawhead. The link missed the slot, struck the surface of the drawhead above the slot, bent, and crushed his fingers. This mishap was due to the fact that the drawhead of the car was from two to three inches below the drawhead of the stationary car in which he had pinned the link. This difference in the height of the two drawheads was due to the defective condition of car No. 10,845. Upon subsequent examination, it appeared that five of the six sills

running lengthwise under the floor of the car had been broken, causing the floor to sag to one side, and one end some two or three inches, carrying down with the sagged end the drawhead in which Hennessey undertook to place the link he was guiding. Hennessey says that he had not observed this defective condition of this car, and supposed it was simply a defectively loaded car, and had been put on the shop track for that reason. He says the projection of the load over the drawhead and the cloudiness of the evening prevented him from seeing the condition of the drawhead. There was no evidence as to why this car had been stopped at Russell, other than that deducible from its condition, its load, and the track on which it was placed. Shortly after the accident the car was found to be chalked, "Huntington Shop," "Transfer," but there was a conflict in the evidence as to whether it had been so marked before or after the accident. There was a verdict for the plaintiff below. The railroad company has sued out this writ of error.

A. M. J. Cochran, for plaintiff in error.

T. N. Ross, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

If the railroad company is liable to Hennessey, upon the undisputed facts of this case, it must be either because it was negligent in permitting the car in question to be and remain in the damaged and dangerous condition it was when Hennessey, in the course of his duty, undertook to couple it to another car, or because it was negligent in not giving to Hennessey notice of that condition before allowing him to make the coupling.

1. Was the company responsible for the condition of the car which Hennessey was hurt in coupling? There is no positive evidence as to when or how the car was damaged or its load displaced. But whether the car had been damaged on the road or in the yard, or the load become displaced before or after it reached the yard, the car had in fact been withdrawn from use, and placed upon the tracks devoted to damaged or improperly loaded cars. The presumption is that it was placed there, not only on account of its displaced load, but also because of its defective condition. In the view we take of the principles of law which govern the case, it is unimportant whether it was placed there for both reasons or only one, and equally unimportant whether the damaged condition had been discovered by the inspector before it was sent to the shop track or not. The fact is, a badly damaged car, with a badly displaced load, displaced, presumptively, as a consequence of the defective character of the car, was standing upon a track devoted primarily to damaged cars. What was the significance of the fact that this car was standing upon the shop or repair track? Hennessey was an old employé. He had worked in this yard for about three years, and was the foreman of his crew. He knew the uses to which tracks 8 and 9 were devoted. That occasionally a car neither defective nor badly loaded was found upon that track is of no moment. The primary use of those tracks was for the storage and repair of damaged cars. From six to eight hundred cars went through this yard every day. They were there stopped and inspected. Cars damaged were taken out

from the trains, and placed on one or the other of these tracks. When full, as sometimes happened, such cars were temporarily placed on other tracks. The evidence was that from six to twenty cars were found defective and stopped each day. Hennessey was employed as a switchman in this yard, and it was part of his duty to handle these damaged cars. He might find such cars on any of the tracks. He knew that the great majority of those standing on the repair tracks had been placed there because they were defective. To get out cars from that track was a part of his duty. It was a duty of each day. To get out cars which had been repaired involved the coupling together of the whole train of separated cars. Among the repaired cars, his experience advised him, were cars too badly damaged to be repaired at Russell, and which it would be his duty to get out and place where they would be transferred to the general shops at Huntington. So he knew that there would be found on the track cars not yet repaired, which would have to be put back after getting out the repaired cars. Manifestly, his duty involved the handling of cars not fitted for use and dangers not incident to the ordinary work of one engaged in the ordinary operation of a train of cars. That a railway company is under obligation to its employés to exercise every reasonable precaution to see to it that damaged cars are not admitted into its trains is well established. Hough v. Railway Co., 100 U. S. 213; Railroad Co. v. Herbert, 116 U. S. 642, 6 Sup. Ct. 590; Railway Co. v. Archibald, 170 U. S. 665, 18 Sup. Ct. 777; Felton v. Bullard (decided by this court May 15, 1899, and not yet officially reported) 94 Fed. 781. That employés may ordinarily rely upon this being the case is also elementary. The rule stated is but an application of the general rule that the master personally owes to the servant the duty of using care and caution in providing for his use reasonably safe instrumentalities of service. Felton v. Bullard, cited above; Hough v. Railway Co., 100 U. S. 213; Gardner v. Railroad Co., 150 U. S. 349–355, 14 Sup. Ct. 140; Shear. & R. Neg. § 194. This, as to railway companies, involves the duty of inspection and of removing from trains all cars found defective. Unless damaged cars are removed from the trains wherein they have become damaged, and placed where they can be repaired, how is the master to provide reasonably safe cars to those servants who are engaged in the operation of his trains, and who have a right to rely upon the master to see that defective cars are not admitted to its trains or continued in use after they become damaged? The rule is well settled that if the work of the employé consists, in whole or part, in dealing with damaged or defective cars, and which, by the very nature of his occupation, he must know, or have reason to know, are unsafe and dangerous, he voluntarily assumes the risk and hazards which are incident to the duty he has engaged to perform. It is not a case where dangerous or defective instrumentalities are supplied by the master to be used in his work, and where notice of such danger should be given, but a case where the instrumentalities to be handled and worked with or upon are understood to involve peril and to demand unusual care. In such cases, the risk is assumed by the servant as within the terms of his contract,

and compensated by his wages. Arnold v. Canal Co., 125 N. Y. 15, 25 N. E. 1064; Yeaton v. Railroad Corp., 135 Mass. 418; Watson v. Railway Co., 58 Tex. 434; Fraker v. Railway Co., 32 Minn. 54, 19 N. W. 349; Kelley v. Railway Co., 35 Minn. 490, 29 N. W. 173; Flanagan v. Railway Co., 45 Wis. 98; Flannagan v. Railway Co., 50 Wis. 462, 7 N. W. 337; Railroad Co. v. Ward, 61 Ill. 130.

In Narramore v. Railway Co. (decided at this term of this court) 96 Fed. 301, Taft, circuit judge, used the following language in defining this doctrine of assumption of risk:

"Assumption of risk is a term of the contract, express, or implied from the circumstances of the employment, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty shall be at the servant's risk. In such cases, the acquiescence of the servant in the conduct of the master does not defeat a right of action on the ground that the servant causes or contributes to cause the injury to himself, but the correct statement is that no right of action arises in favor of the servant at all; for, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers the risk of which he agreed expressly or impliedly to assume. The master is not, therefore, guilty of actionable negligence towards the servant."

2. But it is said that this car was not marked "Shop," and that it was the custom and usage of the yard to thus designate defective cars. This involves the question as to whether the master personally owes to his servants engaged voluntarily, as an ordinary and expected part of their work, in the handling of cars which are defective, and therefore dangerous, the duty of giving personal notice as to the particular car which is defective. The fact that this yard was an inspection point, and that great numbers of broken cars were left there because of their broken and dangerous condition, was known to Hennessey and his co-laborers in the yard. That his duty was to handle such cars, as well as sound cars, is not disputed. Thus, he was daily engaged in a work and at a place which required him to look out for cars which, from their condition, were dangerous to handle. The fact that the defects might not always be obvious, or that some other servant whose duty it was to designate the particular cars which were damaged might neglect that duty, or might insufficiently give notice, constituted part of the very risk incident to the kind of work in which he had voluntarily engaged. The general usage of the yard seems to have been to designate damaged cars in two ways,—by marking on the side of the car in chalk the word "Shop," and by placing the car upon the tracks devoted to broken and badly-loaded cars, and which for one or the other reason had been withdrawn from use. Assuming, in view of the conflict of evidence, that this car had not been marked "Shop," was that a default in duty which the master personally owed to Hennessey, or was it the neglect of a fellow servant? That a car inspector, in respect of the duty of admitting to the trains of the company cars which are defective and dangerous, or in excluding from such trains cars which become dangerous, is the representative of the master, and not the fellow servant of employés engaged in the operation of trains, is well settled. Felton v. Bullard, cited above. But that rule has no application here. Whether the car inspector employed

in this yard had in fact inspected this car, and retired it from use, is not disclosed by any positive evidence. The facts that it was badly damaged, as well as that its load had become displaced, were very obvious facts. That the car had been stopped at Russell, though destined for a point beyond, and had been placed upon the shop track, raises a plain presumption that the car had been withdrawn from use by the inspectors, or some other authority, because of its condition. The result to be accomplished by inspection had happened. The car was withdrawn from use, and placed where a car so withdrawn should be placed under the rule of the yard. The neglect to mark the car "Shop" was a neglect of another part of the general practice or usage of the yard,—a neglect of a detail of the duty of the inspector or other servant who had withdrawn this car from use, and caused it to be placed where Hennessey found it.

In Arnold v. Canal Co., 125 N. Y. 15, 18, 25 N. E. 1064, "the rule and custom of the business in the yard was to chain up or prop up a defective drawhead which had fallen below its proper level, in order to make the couplings meet." This was not done in Arnold's case, and he sustained his hurt, as he claimed, because of the absence of this sort of notice. The court said: "That was a detail of the servant's work in the yard, and not the master's duty to the servant."

In Yeaton v. Railroad Corp., 135 Mass. 418–420, there was a practice for the yard master to give notice to the switchmen of the defective condition of cars which they were called upon to move. Yeaton was an old employé, and much engaged in handling broken cars in the yard, and accustomed to receive personal notice, but also accustomed to examine for himself. The court said:

"Notice was expected to be received in such cases, but he was also in the habit of looking for himself. It was incident to a service of this description that broken cars might sometimes be put in the wrong place in the yard, and that insufficient notice of defects in them, and of their being put in the wrong place, might be given. These are omissions of notice in respect to matters of detail, which cannot be given in advance, and which are not like an omission to give instructions to an inexperienced hand as to the general dangers to which his service will expose him. The duty of giving notice which rests upon a master in such case was recognized and upheld in the case of Wheeler v. Manufacturing Co., 135 Mass. 294. The distinction between the two cases is plain. The one is a notice of the nature of the risk and peril to be incurred in the course of the employment; the other is a notice of the special danger which springs out of a particular fact, which, in its details, cannot be anticipated. The danger arising from the attempt to move a particular car which may happen to come into the yards for repairs, like the danger which would arise from an attempt to split upon a circular saw a particular warped board, is one which, is the nature of the case, it is impossible for a master to point out on every occasion when the workman may be called upon in the course of his employment to use such material. If there was a neglect in such case to give such information to the plaintiff as ought to be given by one upon whom the duty has been devolved by the master, such neglect is to be treated as that of a fellow servant, and the risk of it must fall within the ordinary rule; because it was an incident to the service which the plaintiff undertook that broken cars might be put in the wrong place in the yard, and that insufficient notice of the defects in them might be given. This is not like a case where dangerous or defective machinery is supplied by a master for a servant to use in his work, and where notice of such danger or defect ought to be given; but it is a case where

the material to be handled and to be worked upon is understood to involve risk and the necessity of care. There was no negligence upon the part of the defendant in sending broken cars for repairs to the yard where the plaintiff was at work. This was a proper place for them. There was no negligence in omitting to give notice to the plaintiff that broken cars were to be sent to this yard for repairs, and that his employment included the duty of handling and moving them. All this he knew already. What he did not know was that this particular car was broken, and that broken cars which were sent for repairs might be found in that part of the yard where this car was. While not disposed to relax the strictness of the rule which requires a master to give fair and reasonable information and instruction to a young, ignorant, or inexperienced servant, as to the perils incident to his employment, we cannot. find any warrant, either on principle or on authority, for extending it to a case like the present. Upon the undisputed facts, the risk was one which the law cast upon the plaintiff."

To the same general effect are the cases of Fraker v. Railway Co., 32 Minn. 54, 19 N. W. 349, and Railway Co. v. Ward, 61 Ill. 130.

But, aside from this question that the neglect to mark this car with the word "Shop" was the negligence of a fellow servant, there remains the fact that the warning given by the presence of this car upon the track devoted primarily to damaged cars was in itself a notice to Hennessey, which he could not disregard without assuming all the consequences. That sometimes cars were placed on these shop tracks which were not defective is of no significance, in view of the general uses to which those tracks were devoted. In view of the general duty which rested upon Hennessey to handle damaged as well as sound cars in this yard, he had no right to assume that any car found upon these shop tracks was undamaged. He says he did not see its drawhead, and could not well do so on account of the overreaching load. Yet he assumed its drawhead was in good condition, and, without personal inspection, undertook the coupling. If this car had been in use, he would be justified in assuming, where the defect was not obvious, that the master had discharged his duty in excluding from use all cars which were dangerous by reason of some defect. But this presumption did not exist in reference to this car. The defect was one very easily discovered. The slightest inspection would have advised an experienced brakeman like Hennessey that the end of the car was sagged, and the drawhead below its proper level. Under such circumstances, he assumed the risk, and has no right to say that he relied upon the master's obligation to furnish him safe instrumentalities.

This case was tried upon a totally wrong conception of the principles of law applicable. The request at the conclusion of the whole of the evidence for an instruction to find for the plaintiff in error should have been given. The risk incident to the coupling of this car as a defective car was assumed by the defendant in error. He was also grossly negligent in assuming, without examination, that the drawhead of the car in question was sound. Under no reasonable view which could be taken of the case could there have been a verdict in favor of the defendant in error. Reverse the case, and remand for a new trial.