Norman v. Railroad.

T. F. NORMAN, Administrator, v. SOUTHERN RAILWAY COMPANY.*

(*Knoxville.*   September Term, 1907.)

1. **RAILROADS.** **Not liable for death of switchman, for failure of cars to uncouple, on the ground of negligence, when.**

   A railroad company is not liable, on the ground of negligence, in damages for the death of a switchman killed while employed in the yards for the distribution of freight cars by being thrown from a freight car by a jerk, caused by the conductor's inability to uncouple the cars at the proper moment, on account of a broken link in the coupling pin, a defect not communicated to the deceased, where the failure to uncouple was a very common occurrence well known to the deceased. (*Post, pp.* 406-410.)

2. **SAME.** **Same.** **Conductor's failure to notify switchman of defective coupling chain is not negligence, when.**

   Where a freight car, equipped with a defective coupling pin chain, was nevertheless one which, in the ordinary course of business, deceased as switchman was required to assist in distributing, it was not incumbent on the conductor to notify the deceased of the defect before attempting to uncouple the car, so that deceased could have protected himself from a sudden jerk of the car, due to the conductor's inability to uncouple the car at once with the lever, especially where the failure to uncouple was a very common occurrence well known to the deceased. (*Post, pp.* 410, 411.

---

*As to duty of master to warn servants, see note to James v. Rodipes Lumber Co. (La.), 44 L. R. A., 33.

119 Tenn.—26

Norman v. Railroad.

3. **MASTER AND SERVANT.** Rule as to safe place and safe appliances does not apply, when.

The general rule that the master must furnish a safe place and safe appliances does not apply, when the very work the servants are employed to do consists in making a dangerous place safe, or in constantly changing the character of the place for safety as the work progresses. (*Post, pp.* 411, 412.)

Cases cited and approved: Heald v. Wallace, 109 Tenn., 364; Smith v. Coal & Iron Co., 115 Tenn., 543; Railroad v. Hennessey, 96 Fed., 713, 38 C. C. A., 307.

4. **SAME.** Master is not required to warn servants of transitory danger likely to happen at any time, when.

A master is not required to warn his servants of every transitory risk, when the only thing the servants do not know is the precise time when the danger will supervene, nor when the actual danger which causes the injury is due to a transitory occurrence of such a nature that the injured servant knows it will probably happen from time to time. (*Post, pp.* 411, 412.)

5. **RAILROADS.** Switchman for distribution of defective cars assumes the risks incident to his duties.

A railroad switchman employed in the yards, and charged with the duty of distributing defective cars for repairs, which, by the very nature of his occupation, he must know, or have reason to know, are unsafe and dangerous, he voluntarily assumes the risks and hazards which are incident to the duty he has undertaken to perform. (*Post, pp.* 413, 414.)

Cases cited and approved: Railroad v. Hennessey, 96 Fed., 713, 38 C. C. A., 307; Railroad v. Behymer, 189 U. S., 468.

6. **SAME.** Same. And it is immaterial that a car is not marked defective by the inspector, when.

Where it was the duty of a railroad switchman to handle a defective car, whatever its condition, at the time he was killed by being thrown from the car by a jerk resulting from the failure

Norman v. Railroad.

of the car to uncouple when expected, where he also knew that, whether it was defective or not, it might not uncouple, and in that case he might expect the jerk, it was immaterial whether the car had been marked by the inspector for the defective coupling pin chain attached thereto or not. (*Post, p.* 414.)

7. **SAME.** Violation of rule by conductor tending to prevent accident cannot be complained of by injured switchman, when.

In an action of damages for the death of a railroad switchman caused by a jerk of the car as a result of the conductor's inability to uncouple the car, because the coupling pin chain was broken, it is immaterial that the conductor, in attempting to uncouple the car, violated a rule of the railroad company prohibiting employees from going between the cars when in motion, and directing that, if anything connected with the coupling apparatus was defective, the employee should not attempt to make the coupling, but should make report of the defect. The conductor's violation of the rule could not have contributed in any way to the death of the switchman, but, on the contrary, must have tended to prevent the accident. (*Post, p.* 417.)

8. **SAME.** Declaration not stating a cause of action for the violation of the federal safety appliance act.

Where the declaration for the death of a railroad switchman resulting from a defective coupling pin chain on a freight car avers only incidentally that defendant was a common carrier operating numerous lines of railroad "running to divers places and points in and beyond the State of Tennessee;" but not even averring that the particular car alleged to be defective was being used in interstate traffic, it does not state a cause of action for the violation of the federal safety appliance act prohibiting railroads from using cars in interstate traffic not equipped with automatic couplers obviating the necessity of going between the cars, and providing that there shall be no assumption of risk by any employee injured by going between the cars not equipped according to the act. (*Post, pp.* 417-420.)

Norman v. Railroad.

Act of Congress cited and construed:   Act March 2, 1893, ch. 196.

Cases cited and distinguished:   United States v. Railroad (D. C.), 145 Fed., 438; United States v. Railroad (D. C.), 154 Fed., 897.

9. **SAME.** Failure to repair automatic coupler before distribution of car constitutes no violation of federal safety appliance act.

The failure to repair a defective automatic coupling pin chain before distributing the car to which it is attached does not constitute a violation of the federal safety appliance act whose provisions are stated in the foregoing headnote, where the discovery of the defect and the injury resulting therefrom occur simultaneously, and where no negligence appears for failure to discover the defect earlier. A reasonable time within which to make the repair will be allowed. If the defect had been observed by the inspector before the car was detached from the train, it would still have been detached and distributed, and repairs thereafter made. (*Post, pp.* 420, 421.)

10. **VERDICTS.** Directed upon consideration of the entire evidence.

Wherever the jury is directed to return a verdict, it should be upon a consideration of the entire evidence in the case, and not upon any detached portion of such evidence. (*Post, pp.* 421, 422.)

Case cited and approved:   Greenlaw v. Railroad, 111 Tenn., 187.

11. **SAME.** Same. Directed where there is no controversy as to any material fact.

Where there is no controversy as to any material fact, the court may instruct the jury to return a verdict in accordance with his view of the law applicable to such uncontroverted facts. (*Post,* p. 422.)

Case cited and approved:   Tyrus v. Railroad, 114 Tenn., 593.

Norman v. Railroad.

**12. SAME. Motion for peremptory instructions is not addressed to court's discretion, but presents a question of law.**

A motion for peremptory instructions is not one addressed to the discretion of the court, but one presenting a question of law as to whether there is any determinative evidence on which the jury must base a verdict in favor of the party who produces it.. (*Post, pp.* 422, 423.)

Cases cited and approved:   Traction Co. v. Brown, 115 Tenn., 329; Kinney v. Railroad, 116 Tenn., 451.

**13. SAME. Not to be directed where there is any dispute or doubt upon material and determinative evidence and issues.**

There is no power in the trial judge to direct a verdict where there is a dispute as to any material and determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried. (*Post, p.* 423.)

Case cited and approved:   Kinney v. Railroad, 116 Tenn., 451.

**14. SAME. Improper application of the rule in directing a verdict is no argument against it.**

The fact that the trial judge may sometimes make an improper application of the rule or the fact that there are supposed difficulties in its application because of alleged tendencies of trial judges to encroach upon the province of the jury, constitutes no argument against the soundness of the rule. (*Post, pp.* 423, 424.)

**15. SAME. Directed where a servant assumed the risk, and defendant is guilty of no negligence, when; case in judgment.**

Where, in an action for the death of a railroad switchman, it appears upon the uncontradicted facts that he assumed the risk as a matter of law, and where the facts are such that all reasonable men must draw the same conclusions from them that the defendant was not guilty of negligence, a question of law only is presented to the court, and it is proper for the trial court to direct a verdict for the defendant. (*Post, pp.* 422, 423, 424.)

### FROM KNOX.

Appeal in error from the Circuit Court of Knox County to the Court of Civil Appeals, and Certiorari from Court of Civil Appeals.   Jos. W. SNEED, Circuit Judge.

PICKLE, TURNER & KENNERLY, for plaintiff.

JOUROLMON, WELCKER & SMITH, for defendant.

MR. SPECIAL JUSTICE HENDERSON delivered the opinion of the Court.

This is an action to recover damages for the death of Henry Lucas, alleged to have been caused by the negligence of the railway company. At the conclusion of plaintiff's evidence before the jury, upon motion of defendant, the trial judge directed verdict in favor of defendant, which was rendered, and judgment was accordingly entered. Motion by plaintiff for new trial having been overruled, he appealed in error to the court of civil appeals, where the judgment of the circuit court was affirmed. The case is now before this court upon *certiorari*.

The grounds upon which recovery is sought under the declaration is that plaintiff's intestate, Lucas, was employed as a switchman in defendant's yards, where freight cars were distributed, and while in the performance of his duties as such, and without any fault on his part, he was, by a sudden jerk of the train, thrown from the car upon which he stood, and run over and killed." This sudden jerk is alleged to have been caused by the failure of the conductor to uncouple the car upon which plaintiff's intestate stood from the rest of the train. It is alleged that this failure to uncouple was caused, first, by defective coupling appliances, in that the coupling pin was not attached to the lever on the outside of the car, thus rendering it necessary for the conductor to go between the cars and lift the pin; and, second, by the failure of the inspector to discover and indicate the alleged defect, or the failure of the conductor to observe it.

The facts are: The deceased, Lucas, was about twenty-five years of age. He was employed as switchman in defendant's yards at Lonsdale, near Knoxville, and had been so employed and engaged in the work for some three years. These yards were used as a place to make distribution of freight cars to be carried on the various lines of defendant connecting at that point.

When the train of cars arrives at the yards, it is the duty of the inspector to go around and inspect each car. If any are found to be out of repair to the extent that they should be taken out of the train, he indicates this

by a certain mark placed upon the car. When the conductor and switchmen find a car thus marked, they take it to what is called the "repair track," and there it is left for repairs.

If the inspector finds a car with only slight defects, not sufficient to require the car to go to the repair track, but to be distributed along with the other cars for distribution, he indicates this by a certain other mark, which indicates that the repairers will make the necessary repairs while the car is in the train; the car, however, to be distributed by the conductor and switchmen along with the other cars for distribution, as if it was not marked at all.

The yards are known as "gravity yards." The cars to be detached from the train, are backed up by the engineer to the proper point, where they are uncoupled by the conductor of the yards and allowed to roll down to the proper track, while the switchman rides them and manages the brakes.

Walter Cates was the conductor in charge of the yards on this occasion, and had been for some $3\frac{1}{2}$ years prior thereto. The deceased, Lucas, was the switchman, and, as before stated, had been so employed for some three years, and on different occasions had himself temporarily acted in the capacity of conductor, and was experienced in the business, fully acquainted with the duties. He stood upon the rear end of the rear car to be detached from the train. The train was backed slowly

up, when Cates stepped up to uncouple the car, that it might roll down the grade.

The train was equipped with couplers constructed with a crank or lever to which is attached a chain fastened to the coupling pin. By the turning or raising of the crank or lever, without going between the cars, the pin is raised and the cars thus uncoupled. On this car the chain had been broken so that the lever did not raise the coupling pin. Cates then went between the cars to raise the pin, but did not succeed in this. The engineer stopped the train, as was usual, when the car upon which deceased stood ran out its slack, as the witnesses say, causing a slight jerk. About this time deceased fell from the car in front of the train as it rolled back, and one wheel ran over his head, crushing his skull, from the effect of which he died.

It was not unusual—the witnesses say that it was a common thing of frequent occurrence—that the conductor would fail for one reason or another to uncouple the car at the first effort, a fact which was, of course, known to the deceased, and that at such times there would be a jerk by the sudden stopping of the car attempted to be detached, instead of rolling on down the grade.

The inspector did not discover this defect in the coupling appliance, or, if he did, he failed to mark the car, or indicate it in any way. The conductor failed to observe the defect, and failed to detect the mistake of the inspector until he attempted to uncouple. It is insisted

that this negligence of the inspector and conductor, and particularly of the latter, who was deceased's superior and vice principal of the company, was the proximate cause of the death of the deceased, and that such negligence was not one of the risks assumed by deceased in his employment.

It is argued that this risk arose from the neglect of the master to perform his absolute and positive duty to the servant in furnishing safe appliances; that the death of the deceased was the proximate result of the failure of the master, who was represented by the inspector and conductor, to warn the deceased of the existence of a danger well known to the master, and of which the master knew the deceased to be ignorant.

The failure to uncouple, as above stated, the proof shows, was a very common occurrence, a common incident to the service, with which deceased, an experienced switchman, was familiar; and it was clearly his duty to look out and be prepared for such. He knew nothing of the defect in the coupling appliances, it is true; but, from his experience in matters of this sort, he knew that, whether the appliances were defective or not, the conductor might, for some reason, fail to make the uncoupling, and it was his duty to be prepared for such.

Proof of the mere fact that there was a broken link in the chain attached to the coupling pin, so that the lever would not raise it when applied, is not of itself negligence. In this case it was a part of the business of deceased to handle damaged or defective cars. Even if the

conductor had known of the defect, and had attempted, notwithstanding this, to make the uncoupling, it would not have been actionable negligence on his part to have failed to notify the deceased thereof before attempting to uncouple; for the car, in the ordinary course of the business, would have been distributed as was attempted to be done. The car would have been taken out of the train, even had its defects been such as to require its removal to the repair track; and it was not incumbent on the conductor to notify the deceased of such defects.

The inspection and marking of the cars was not for the warning and benefit of switchmen, but to indicate where they must be taken. Whatever their condition was, it was a part of the duty of the switchmen to handle them. There is more or less danger attached to this.

While it is the general rule that the master must furnish a safe place to work and safe appliances, the rule cannot be of universal application. It is held not to apply in cases of working of mines, when the "very work the servants are employed to do consists in making a dangerous place safe, or in constantly changing the character of the place for safety as the work progresses." *Heald* v. *Wallace,* 109 Tenn., 364, 71 S. W., 84; *Smith* v. *Coal & Iron Co.,* 115 Tenn., 543, 92 S. W., 62.

Discussing the cases on this subject, it is said, in 1 Labatt on Master and Servant, section 268:

"These decisions proceed upon the broad ground that employers cannot be required to warn their men of every transitory risk, when the only thing the men do

not know is the precise time when the danger will supervene, nor when the actual danger which caused the injury was due to transitory occurrence of such a nature that the plaintiff must have known that it would probably happen from time to time."

The rule requiring the master to furnish safe place and safe appliances is earnestly urged and relied on by counsel for plaintiff. Its inapplicability to facts similar in many respects to those of this case is forcibly and aptly illustrated by the opinion of Judge Lurton in the case of *Chesapeake & Ohio R. R. Co.* v. *Hennessey,* 96 Fed., 713, 38 C. C. A., 307.

In that case the plaintiff, Hennessey, was employed as a switchman in the defendant's yards, and it was a part of his duty to handle defective cars. He was injured while making a coupling to a damaged car, of which he had no actual knowledge or notice. There were two questions in the case upon which the company's liability depended. The first was whether the company was negligent in permitting the car in question to be and remain in the damaged and dangerous condition it was in when Hennessey in the course of his duty undertook to couple it to another car. Second, whether the company was negligent in not giving to Hennessey notice of that condition before allowing him to make the coupling. On the first question it was held that a switchman employed by the railroad company in its switch-yards at the end of a division, where trains were inspected and defective cars taken out and placed on side tracks for repair or

removal to the shop, and whose daily duty it is to couple and handle such defective cars, assumes the extra risk due to their defective condition, and which is necessarily incident to his employment. In discussing this question, Judge Lurton uses the following language, which is pertinent to the case under investigation:

"That a railway company is under obligation to its employees to exercise every reasonable precaution to see to it that damaged cars are not admitted into its trains is well established. . . . That employees may ordinarily rely upon this being the case is also elementary. The rule stated is but an application of the general rule that the master personally owes to the servant the duty of using care and caution in providing for his use reasonably safe instrumentalities of service. . . . This, as to railway companies, involves the duty of inspection and of removing from trains all cars found defective. Unless damaged cars are removed from the trains wherein they have become damaged, and placed where they can be repaired, how is the master to provide reasonably safe cars to those servants who are engaged in the operation of his trains, and who have a right to rely upon the master to see that defective cars are not admitted to its trains, or continued in use after they become damaged? The rule is well settled that if the work of an employee consists, in whole or in part, in dealing with damaged or defective cars, and which by the very nature of his occupation he must know, or have reason to know, are unsafe and dangerous, he volun-

tarily assumes the risks and hazards which are incident
to the duty he has engaged to perform.  It is not a case
where dangerous or defective instrumentalities are sup-
plied by the master to be used in his work, and where
notice of such danger should be given, but a case where
the instrumentalities to be handled and worked with or
upon are understood to involve peril and to demand un-
usual care.  In such cases the risk is assumed by the
servant as within the terms of his contract and compen-
sated by his wages."

It can make no difference whether the car was marked
by the inspector for the particular defect or not.  It was
a part of the business of deceased to handle it, whatever
its condition.  He knew that, whether defective or not,
it might not uncouple, and therefore he must look for a
jerk, and be prepared for it.

The case of *Railway Co.* v. *Behymer*, 189 U. S., 468,
23 Sup. Ct., 622, 47 L. Ed. 905, is cited by counsel for
plaintiff as an authority upon the question of the as-
sumption by the brakeman of the risk of the jerking of
the cars.

In that case there was verdict and judgment in favor
of plaintiff in the State court of Texas, and the case was
carried to the supreme court of the United States by
writ of error.  The plaintiff, a brakeman, was ordered by
the conductor of a local freight to get upon some cars
standing on the siding and to let off the brakes, so that
the engine might move them to the main track.  The
top of the cars was covered with ice, as all concerned

knew.  He obeyed the orders.  The engine picked up the cars, moved to the main track, and stopped suddenly. The jerk caused by the sudden stop upset plaintiff. The bottom of his trousers caught in a projecting nail on the running board, and he was thrown between the cars.

Plaintiff's claim is based upon negligence in stopping the car so suddenly, with a knowledge of his position, in slippery condition of the roof and the projection of the nail, which increased his danger and contributed to his fall. Stress is laid by the court upon the fact that by a statute of Texas, if there was negligence, the fact that it was the negligence of a fellow servant was not a defense.  The court says:

"The fundamental error alleged in the exceptions to the charge is that the court declined to rule that the chance of such an accident as happened was one of the risks that plaintiff assumed, or that the question whether the defendant was liable for it depended on whether the freight train was handled in the usual and ordinary way. Instead of that the court left it to the jury to say whether the train was handled with ordinary care; that is, the care that a person of ordinary prudence would use under the same circumstances.  This exception needs no discussion.  The charge embodied one of the commonplaces of the law."

It is insisted by counsel for plaintiff that the Texas statute cuts no figure in the case.  We think it was controlling, for the main questions to be submitted to the

jury were whether the engineer negligently backed the train in view of the peculiar conditions existing at the time, and whether the inspector was negligent in leaving the projecting nail in the running board. If negligence in either of these particulars contributing to the injury be shown, under the Texas statute, the defendant would be liable; and the same rule would apply if the conductor gave a negligent order. So there were very material questions of fact to go to the jury. The court further says:

"No doubt a certain amount of bumping and jerking is to be expected on freight trains, and under ordinary circumstances cannot be complained of, yet it can be avoided if necessary, and, when the particular and known condition of the train makes a sudden bump obviously dangerous to those known to be on top of the cars, we are not prepared to say that a jury would not be warranted in finding that an easy stop is a duty."

As the engineer backed the train, Cates, the conductor, was at his place to shift the lever, when he found it was disconnected from the coupling pin. He says:

"And when I got the slack, I reached after the pin as I usually do very often, and when I reached after the pin he [engineer] had just caught the slack against the pin, and I couldn't get it up. . . . And when I reached after the lever, I grabbed for it, but didn't see it; and, when I reached after it, there was so much slack against it that I couldn't pull the pin from the car."

Had the chain not been broken, he could have lifted

Norman v. Railroad.

the pin without going between the cars, and would all
the time be in sight of the engineer. When the coupling
appliance is in good order, the lever still will not raise
the pin, unless he works it just as the slack comes. Af-
ter the lever failed to work in this instance, he stepped
between the cars.

In this connection, plaintiff introduced a rule of the
company, the substance of which is to prohibit em-
ployees from going between the cars when in motion.
If anything connected with the coupling apparatus be
defective, the employee must not attempt to make the
coupling, but must make report of same. Conductors
and yard foremen are required to see that trainmen
and yardmen do not violate these instructions.

The fact that the conductor violated the rule of the
company, by going between the cars in order to un-
couple, cannot affect the merits of this case. By that
act he simply took upon himself the risk of injury, and
the rule in this particular instance was for his own pro-
tection. It could not in any way contribute to the death
of deceased, but exactly the contrary; for if, by this, he
had succeeded in making the uncoupling, there would
have been no jerk of the car.

It is next insisted on behalf of plaintiff that this car
was used in interstate traffic, and that the case falls
within the federal statute forbidding the use of cars
without automatic couplers, and that defendant was neg-
ligent in having its employees to handle this car before
this coupling was made to comply with the federal stat-

119 Tenn.—27

ute. The statute referred to is Act of Cong., March 2, 1893, c. 196, section 2, 27 Stat., 531 [U. S. Comp. St., 1901, p. 3174]:

"It shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line, any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

Section 8:

"Any employee of such common carrier who may be injured by any locomotive, car, or train in use contrary to the provisions of this act, shall not be deemed thereby to have assumed the risk thereby occasioned, although continuing in the employ of such carrier after the unlawful use of such locomotive, car, or train had been brought to his knowledge."

In support of plaintiff's contention, the two following cases are cited: *United States* v. *Great Northern Ry. Co.* (D. C.), 145 Fed., 438; *United States* v. *Southern Pacific Co.* (D. C.), 154 Fed., 897.

Both cases were actions brought to recover penalties provided by the statute. In the former case, the sole question decided is that the act of congress applies to all cars regularly used on any railroad engaged in interstate commerce, not only while actually in use in such commerce, but at all times when in use on such road. The question arose upon demurrer to certain causes of action. Whitson, District Judge, says:

"To sustain the demurrer would be to hold that it is beyond the power of congress to control the instrumentalities through which interstate commerce may be carried on.  But the prerogative necessarily carried with it the authority to prescribe the  rules  and  regulations which shall apply to those engaged in it.  Illustrations of the futility of any effort on the part of congress to exercise its constitutional powers in this regard, if the contention made by the defendant can be sustained, are not far to seek.  An interstate carrier might haul traffic from one State to another, then transfer it, and from thence transport it, without any of the safety appliances provided by law."

The latter case (*United States* v. *Southern Pacific Co.*) was also on demurrer.  There was prosecution for violation of the safety appliance act, in that the chains connecting the lock pins to the uncoupling levers were broken, or missing, as in the case at bar; and, while it is held that it was no defense that the car was moved by defendant without knowledge of the defects, Wolverton, District Judge, says:

"Admittedly, if a breakage occurs between stations where repair shops are located, and the repairs cannot be made without taking the car to such a place, the company cannot be held liable until it has had an opportunity of making the repair, and in that event it would be justified in hauling the car in the train to the succeeding station where such repairs could be made."

We have thus referred to these cases, since learned counsel has so earnestly pressed the matter of the applicability of the act in question to this case. But no such case as is contended for is made by the declaration. It is only alleged incidentally that defendant was a common carrier operating numerous lines of railroad "running to divers places and points in and beyond the State of Tennessee." But there is even no averment that the particular car referred to as defective was being used in the carriage of interstate traffic, and thus no notice is given defendant that it will be required to meet the case now contended for. The acts of negligence averred are only those referred to in another connection.

Assuming it to be proven that these cars were used in moving interstate traffic which does not definitely appear in the proof, and that the declaration avers a case under the statute, the statute has no application to the facts of this case. The couplers are shown to be automatic couplers. They were out of repair, and the defect was of such slight character that it could be repaired with the car in the yards, without the necessity of being taken to the shops. Had the defect been observed by the inspector before the car was detached from the train, the car would still have been detached and distributed, and the repairs thereafter made. To do this switching, when the defect is first discovered as the switching is being done, the failure to repair it at once without attempt-

ing to move the car to another place in the yards would
not in any sense be a violation of the statute. No mat-
ter how skillfully machinery may be constructed, it will
get out of repair, and a reasonable time within which to
make the repair will be allowed. In this instance the
discovery of the defect is simultaneous with the injury,
and there is no evidence that the failure to discover it be-
fore the car reached the yards was negligence.

Learned counsel for plaintiff has submitted an ex-
haustive brief, citing and discussing numerous decis-
ions, state and federal, on the subject of peremptorily
directing verdicts. While the practice in this State is
of recent origin, it has long been the practice in other
jurisdictions, and its beneficial results in reaching an
end of litigation have been demonstrated. The proper
application of the rule in particular cases to which it is
applicable is not in any sense an invasion of the province
of the jury, because it cannot be applied if there be any
material controverted fact to be found by the jury.

Our first case on the subject is *Greenlaw* v. *Railroad,*
114 Tenn., 187, 86 S. W., 1072; opinion by Mr. Justice
Wilkes, in which it is said:

"There are a number of cases in our books which seem
to hold that the practice of directing a verdict does not
prevail in Tennessee. Undoubtedly in other jurisdic-
tions the weight of authority is that such a practice is
proper and conducive to the prompt and proper determ-
ination of legal controversies. . . We think, how-
ever, that, wherever the jury is directed to return a ver-

dict, it should be upon a consideration of the entire evidence in the case, and not upon any detached portion of such evidence."

In *Tyrus* v. *Railroad,* 114 Tenn., 593, 86 S. W., 1074, Mr. Justice Neil delivering the opinion of the court, it is shown that the trend of our own decisions has been in this direction, and they themselves demonstrate the necessity for the adoption of the rule. The rule as laid down in that case is the legitimate deduction from those decisions:

"The following we conceive to be a sound statement of the matter within the restrictions of our constitution: Where there is no controversy as to any material fact, there is nothing for the jury to find. The question is then one solely of law for the court, and in such a case the court may instruct the jury to return a verdict in accordance with his view of the law applicable to such ascertained or uncontroverted facts. There can be no constitutional exercise of the power to direct a verdict in any case in which there is a dispute as to any material evidence, or any legal doubt as to the conclusion to be drawn from the whole evidence, upon the issues to be tried." *Tyrus* v. *Railroad,* 114 Tenn., 593, 86 S. W., 1077.

In *Traction Co.* v. *Brown,* 115 Tenn., 329, 89 S. W., 320, opinion by Mr. Justice Wilkes, it is said:

"A motion for peremptory instructions is not one which addresses itself to the discretion of the court, but one which presents a question of law; and the crucial

question in the case is whether there is any determinative evidence upon which the jury must base a verdict in favor of the party who produces it.

". . . . When a given state of facts is such as reasonable men may fairly differ upon the question as to whether there was negligence or not, the determination of the matter is for the jury. It is only where the facts are such that all reasonable men must draw the same conclusions from them that the question of negligence is ever considered one of law for the court."

In *Kinney* v. *Railroad Co.*, 116 Tenn., 451, 92 S. W., 1116, it is said:

"There is no power in the trial judge to direct a verdict in any case in which there is a dispute as to any material, determinative evidence, or any doubt as to the conclusion to be drawn from the whole evidence upon the issues to be tried."

Learned counsel for plaintiff lays stress upon the decisions relating to this practice of the United States circuit court of appeals of the sixth circuit, stating that they can be safely followed. A number of the cases of that court are collated and discussed, and it appears from them, which counsel admit, that there is no conflict between the decisions of that court and of this court.

It is alleged that one of the chief difficulties in the application of the rule is the disposition of the trial judge to weigh the evidence, pass upon its value, and thus invade and encroach upon the just province of the jury. The fact that the trial judge may sometimes make im-

proper application of a proper rule of practice can sure-
ly constitute no argument against the rule.   The same
may be said of many other rules.

We think that upon giving to the evidence in this case
the construction most favorable to the plaintiff, and
from that evidence and the inferences justly to be drawn
therefrom in his favor, there was no controverted ques-
tion of fact to be submitted to the jury, and that the judg-
ment of the law upon the whole evidence is that plaintiff
has not made out a case of negligence against defendant.
Such is pre-eminently a proper case for the trial judge to
direct a verdict in favor of defendant.   And the judg-
ment of the court of civil appeals, affirming the judg-
ment of the circuit court, is affirmed.