[Civ. No. 1272. First Appellate District.—April 23, 1913.]

HILMA GARDSTROM, Administratrix of the Estate of Werner Gardstrom, Deceased, Appellant, v. THE L. E. WHITE LUMBER COMPANY (a Corporation), Respondent.

MASTER AND SERVANT—ACTION BY EMPLOYEE FOR INJURIES RECEIVED IN THE SERVICE—NONSUIT.—An appellate court, in reviewing the action of the trial court in granting a nonsuit in an action by an employee against his employer for injuries received, takes the plaintiff's evidence, with every inference of fact that can be legitimately drawn therefrom, as true, and interprets the evidence most strongly against the defendant.

ID.—NEGLIGENCE—QUESTION FOR JURY.—In such action negligence is a question of fact for the jury, even when there is no conflict in the evidence, if different conclusions upon the subject can be rationally drawn from the evidence.

ID.—DEFECTIVE LOCOMOTIVE ORDERED TO SHOPS FOR REPAIRS—INJURY TO EMPLOYEES.—Where railroad employees are directed to take a defective locomotive to the shops for repairs, but instead of so doing they take the locomotive to go in another direction to dinner, the railway company is not responsible for the death of one of them by the overturning of the locomotive while being so used.

ID.—SAFE PLACE AND APPLIANCES—CRIPPLED LOCOMOTIVE ORDERED TO SHOPS FOR REPAIRS.—Where a railway engine has been crippled, and employees are ordered to take it to the shops for repairs, the rule as to furnishing a safe place in which to work and fit appliances for use does not apply.

ID.—VICE-PRINCIPAL—ENGINEER AND BRAKEMAN.—Where a railway engine is out of use and is ordered to the shops for repairs, but the crew use it to go in another direction to dinner, the engineer is not a vice-principal as to a brakeman with him on the trip.

APPEAL from a judgment of the Superior Court of Mendocino County and from an order refusing a new trial.   J. Q. White, Judge.

The facts are stated in the opinion of the court.

T. J. Weldon, W. D. L. Held, and L. Gonsalves, for Appellant.

L. A. Redman, and McNab & Hirsch, for Respondent.

CHIPMAN, P. J.—This action was commenced by plaintiff as administratrix on behalf of and for the benefit of the heirs of Werner Gardstrom, who, it is alleged, was killed while in defendant's employment and through its negligence.  At the close of plaintiff's testimony the court granted defendant's motion for a nonsuit made on the following grounds: "1. That none of the allegations of the complaint charging the defendant with negligence have been proven; 2. That the evidence that has been introduced regardless of the allegations of the complaint is totally insufficient to sustain any charge of negligence or to sustain a verdict; 3. Upon the ground that if the evidence shows any negligence whatever it was the negligence of a fellow employee of the deceased and therefore a verdict against the plaintiff (defendant?) would not be sustained thereon."   A motion for a new trial was denied and defendant had judgment dismissing the action and for its costs. Plaintiff appeals from the judgment and order denying her motion for a new trial.

It is alleged in the complaint that, on May 28, 1910, plaintiff's intestate was in the employ of defendant in the capacity of brakeman on a logging train operated in Mendocino County and, while so employed, "said train was operated by an engine which was not reasonably fit for the use in which it was employed, and . . . said engine was defective in this: The frame thereof was sprung to such an extent as to cause the same to be not reasonably fit for the use in which it was employed"; that defendant "did not exercise ordinary care to provide a reasonably safe engine for the purpose aforesaid, nor to keep the same in a reasonably safe condition"; that defendant did not exercise ordinary care to furnish deceased a reasonably

safe place to work, nor keep the same in a reasonably safe condition, "nor was said roadbed reasonably safe for work; that in his employment as aforesaid . . . said deceased was under- the orders of the superintendent for said defendant" . . . who "did wrongfully order and direct said deceased and the crew of said logging train to move and o'perate said logging train and said engine . . . over said roadbed," knowing "that said engine was not reasonably fit for the use in which he ordered and directed the same to be employed; that by reason of the said defective engine and said defective roadbed and said orders of said superintendent, and without any fault or neglect on the part of said deceased and by reason of the fault and neglect of said defendant, said engine and the train which was operated thereby, and upon which deceased, in the course of his employment was then riding, were derailed, and said deceased crushed under the same and instantly killed."

The answer denies the material averments of the complaint and states that "the alleged death of Werner Gardstrom by reason of the accident referred to in the complaint was due to and caused by said Werner Gardstrom's own carelessness and negligence directly and proximately contributing thereto," and that if the death of said Gardstrom "was due to the carelessness or negligence on the part of any other than the said Gardstrom, it was due to and caused by the carelessness of some other person or persons in the same general business in which said Gardstrom was employed and engaged in the same department of labor"; and that "the dangers to which plaintiff alleged Werner Gardstrom was subject were risks incident to the work" he "was employed to perform" and he "assumed such risks in accepting and continuing in said employment."

There was no evidence touching the condition of the roadbed as a contributing cause to the accident. The evidence was addressed to the condition of the engine as showing its unfitness for the uses being made of it and hence rendering it an unsafe appliance with which to work. Reading the complaint one would receive the impression that the injury was received while the deceased and the crew of the logging train referred to were operating "said logging train and said engine from said woods to the said sawmill over said roadbed," whereas, the accident did not happen while a logging train was being

moved. It happened, as we shall presently see, when the engine was detached from the logging train and was some distance from it and was not employed in hauling cars or engaged in its usual service.

There were two trains being operated by defendant at this time—one a gravel train with Charles A. Brown as engineer, the other a logging train, Eric West as engineer, engaged in hauling logs from Camp 7 to Camp 2, eight or ten miles apart. At Camp 2 it "switched off and took empties and another train took the logs in." On the day of the accident West returned with these "empties" with the rear end of his engine in front of the train, thus backing along the road. The crew consisted of West, engineer; Harry Bridgeford, fireman; Werner Gardstrom (deceased), head brakeman, and William Briscoe, second brakeman. What Gardstrom's duties were does not appear except as it may be inferred from his position as brakeman. On the day of the accident, between ten and eleven o'clock of the forenoon, as West's train was moving along between the two camps, Brown's train coming from the opposite direction, his locomotive being in front, collided with the rear end of West's engine, at a point on the road a short distance from a place called Salsig where defendant had a store, and about twenty-seven miles from Greenwood where the defendant's repair shops were located. Engineer Brown testified: "About ten o'clock in the morning, I was going towards Greenwood, and my position on my train was engineer. I was coming down the grade from the side track, and the train on which West was engineer was coming up. His engine was backing up where there were two turns with about fifty yards between them. As he came around one I came around the other" and the engines collided. "After the collision, Mr. Hendrickson was notified and came there while we were fixing the wreck. Hendrickson's position with the company was woods boss. So far as I know, in the performance of duty Mr. Hendrickson got orders from the superintendent, and he had his orders for the train gang or for the woods, the woods crew, he got them from the superintendent." He testified that after the track was cleaned up both trains went to the store, one remaining on the main track and the other went to a side track. "As soon as we had done that, we all went back to the cook house for dinner. In order to do

that, we had to pass the scene of the collision, the gravel switch and the scene of the accident afterwards. . . . From the store side track up to the cook house was about three miles.'' He testified that they went back to the cook house on West's engine—the entire crew of both trains, West driving. ''When we started down the track on the way to Greenwood after dinner, I did not notice a car in front of me. . . . I first noticed there was a car there when we tipped over; just as the engineer hollered, the car jumped the track. . . . I subsequently discovered at the time of the accident, that there was an empty truck in front of the locomotive and pulled by the locomotive. I would describe that truck to be a half car used for hauling logs. It is just half a car or small truck. I believe it is six feet. In hauling logs, those half cars are hooked together in order to carry the full length log. . . . It was on a part of the railroad we had crossed in going up, and part of the railroad that both engines were in the habit of going over every day, and had been for a long time. The place where the accident occurred was almost level, if anything, I think it was a little up grade. We had just come down a grade, going along a level and were just starting up. I was sitting in the cab at the front tier of wood, Eric was running the engine, Bridgeford was firing and Gardstrom was standing in the fireman's gangway. . . . My attention was first called to the accident when the engineer hollered. I leaned over and he said something about a car. I could not catch distinctly what he said. I leaned over, and as I leaned to the right to his side of the cab, everything started then and that was all there was to it; we went overboard.'' West testified that his train crew consisted of himself, engineer; Bridgeford, fireman; Gardstrom (deceased), head brakeman, and Briscoe, hind brakeman; that when anything happened to his engine that he could repair he fixed it himself, otherwise he took it to Greenwood where the company had a round house and repair shop.

It appeared that after cleaning up the wreck, which was not a bad one, Brown and West moved their trains to Salsig, a short distance, where the store was. This was about half past twelve o'clock. Both crews then got aboard of West's engine and went back to the cook house for dinner, which was in an opposite direction from Greenwood. West testified: ''After the

collision, myself and my train crew were there at that point until about half past twelve, engaged in cleaning up the wreck. I saw Mr. Hendrickson there, the man who gave me orders. He just came out a little while and then walked down to Salsig. Before he went to Salsig I had a conversation with him in which I told him I was broke down and had to go to town (Greenwood). He said he would go down and telephone. After that I saw him and had a conversation with him, in which he told me to take the locomotive and half a car and go to town. . . . The hind end of my engine was broken down in the collision. Going from Salsig up to the cook house, I observed that my engine was riding to the fireman's side. That was the side that afterwards tipped over. She was riding on what we call the rub irons. The bolster or truck runs across heavy plates and then there are heavy plates from the boiler down and there is about two inches on a side for the engine to ride on and roll back and forth. She was lying right down; she could not roll on that side and would strike hard on this side when she came away. . . . After dinner I started out for Greenwood. On the way to Greenwood my engine tipped over. We had gone about three-quarters of a mile when this happened. . . . Q. Did Mr. Hendrickson say anything to you about going to the cook house, then down to Greenwood? A. No, he did not. Not to my knowledge he did not. Mr. Gardstrom did not at any time give me any orders relating to keeping my engine in repair or anything of the kind. At the time of the accident . . . I was going along there at the rate of about six to ten miles an hour, with half a truck in front of us. The curve was bad, and the first I noticed, this car or this truck rather jumped the track." He testified further. "The injury to my engine was on the low or fireman's side of the engine. There was nothing broken that I saw on the fireman's side. The only thing broken about the engine was the rear of the tender. . . . The drawhead was twisted loose and the woodwork was broken. Some of the frame on my engine was broken. I examined the truck and wheels, but I could not say whether there was an injury to that of any kind. It did not run on the track the same as it always did. I didn't see any injury to the track or wheels. . . . At the time we came on to this place where the accident occurred where we upset, there was about a two per cent grade I guess.

That is a very light grade. . . . I didn't stop to make any examination of the condition of affairs to see how it looked; I just looked for Mr. Gardstrom. . . . The only part of the whole engine that was injured was the rear of the tender in the rear of the bulkhead. . . . As far as I know, nothing lifted the car which was in front of my engine.''

This is substantially all the evidence that appears to have any bearing upon the questions presented, stated more fully, perhaps, than was necessary. The rule governing appellate courts in reviewing the action of trial courts in granting nonsuits is well settled. ''The motion for nonsuit admits the truth of plaintiff's evidence, and every inference of fact that can be legitimately drawn therefrom; and upon such motion, the evidence should be interpreted most strongly against the defendant. If there is any evidence tending to sustain plaintiff's action, the nonsuit should be denied, without passing upon the sufficiency of such evidence.'' (*Kramm* v. *Stockton Elec. Ry. Co.*, 3 Cal. App. 606, 609, [86 Pac. 738, 739].) In *Herbert* v. *Southern Pac. Co.*, 121 Cal. 227, [53 Pac. 651], the court said: ''The rule is, that negligence is a question of fact for the jury, even when there is no conflict in the evidence, if different conclusions upon the subject can be rationally drawn from the evidence.'' (See *Hoff* v. *Los Angeles Pac. Co.*, 158 Cal. 596, [112 Pac. 53]; *Zibbell* v. *Southern Pac. Co.*, 160 Cal. 237, [116 Pac. 513].)

It must be conceded that West's engine is shown to have been put out of commission—i. e., it was no longer in condition for the service in which it was used. West so reported to his employer and so testified, and the order by Hendrickson to run it to the shops for repairs at Greenwood implies as much. What was done? Both crews of the two trains—Brown's and West's got aboard of this crippled engine and went in another direction to the cook house for dinner. No direction was given them to do this. No duty and no necessity required it of them. Only West and his fireman had any office to perform in operating the engine, or were required in taking the engine to Greenwood. Its condition was known to all of them—Gardstrom with the rest. It does not appear who suggested going back to the cook house. Apparently it was the spontaneous and voluntary act of each one of the men, the object being, a natural one, to assuage their hunger. Re-

turning from the cook house and before reaching Salsig, where they had left their trains, the engine turned over and Gardstrom was killed. It is not claimed, and cannot reasonably be claimed, that the collision which crippled West's engine was the proximate cause of the injury. The liability of defendant, if liable at all, must arise from the circumstances happening after the engine left the cook house and from the relation of the parties—particularly Gardstrom—to those circumstances. Hendrickson's order was to West to take his engine to Greenwood. No order was given to Gardstrom. His duty as brakeman was with the cars; he had no duty to perform with the engine any more than did Brown's crew who were also on the engine when it tipped over. Both trains had passed and repassed over the road many times without accident; no defect in the roadbed or the curvature of the track at the point of the accident was shown to which the accident was attributed by any of the witnesses. Whether the truck which was being pushed ahead of the engine was the cause of the engine's tipping over cannot be determined from the evidence, nor does the evidence point to any distinct cause. No examination of the track was made and we know only that the rear end of the tender of the engine was injured. West could see no injury to its trucks or vital parts. All that he observed was that the engine "was riding to the fireman's side . . . lying on what we call the rub irons," but it was not testified nor any opinion given that this contributed to the accident. It is not possible to determine from the evidence whether the engine tipped over because of the condition the collision left it in or from its being improperly operated or some other cause. But we think, in view of the facts, the rule of law which governs this case relieves the defendant from liability. The engine having been crippled it was the duty of the employer to order it taken to the shops for repairs and the rule of law respecting a safe place in which to work and the furnishing of fit appliances does not apply. The rule is stated in *Chesapeake etc. R. R. Co.* v. *Hennessey*, 96 Fed. 713, [38 C. C. A. 307], as follows: "The rule is well settled that if the work of the employee consists in whole or in part in dealing with damaged or defective cars and which by the very nature of his occupation he must know or have reason to know are unsafe and dangerous he voluntarily assumes the risks and

hazards which are incident to the duty he has engaged to perform. It is not a case where dangerous or defective instrumentalities are supplied by the master to be used in his work and where notice of such a danger should be given, but a case where the instrumentalities to be handled and worked with or upon are understood to involve peril and to demand unusual care. In such cases the risk is assumed by the servant as within the terms of his contract and compensated by his wages.''

Of the duty of the employer under circumstances such as appear here, the court, in *Brown* v. *Chicago etc. R. R. Co.,* 59 Kan. 70, [52 Pac. 65], very properly said: ''All know that cars are frequently broken and injured by use and when that occurs both duty and interest require that the company shall cause them to be repaired and made reasonably safe for use. To accomplish this it is necessary that they should be removed to the repair shops and it is necessary that employees shall assist in moving them. As a general rule an employee who handles such cars with knowledge of the defects will be held to have assumed the risks incident to such work. One who is employed to handle broken and disabled cars cannot shut his eyes to the hazardous character of the service nor invoke the rule which requires the company to furnish safe machinery and appliances. In order to conform to the requirement of that rule the company must bring in broken and disabled cars and repair them.''

And the employee is charged with the assumption of the risk in operating such cars although he may not have knowledge of the precise nature of the defect in them. (*Kelley* v. *Chicago etc. R. R. Co.,* 35 Minn. 490, [29 N. W. 173].)

Appellant cites *Southern Ry. Co.* v. *Hart* (Ky.), 64 S. W. 650. In that case the court said: ''there can be no question that where one is employed to handle damaged cars there is no duty imposed upon his employer to see that the car is safe, and he assumes the risks and hazard which are incident to such employment; and such an employee stands on a different ground from one whose master furnishes dangerous or defective tools to be used in his work without notice to his employee. In such a case the usual and ordinary risk is assumed by the servant as within the terms of his contract. The rule in a case of this character is well stated in the case of *Chesa-*

*peake etc. R. R. Co.* v. *Hennessey,* 96 Fed. 713, [38 C. C. A. 307]."

The plaintiff prevailed in the case cited and the Hennessey case was distinguished upon obvious grounds, but the doctrine of the Hennessey case was approved.

Respondent makes the point that the evidence discloses an entirely different case from that alleged in the complaint and that plaintiff "must recover, if at all, upon the cause of action set out in his complaint, and not upon some other which may be developed by the proofs," and that "a variance between the pleadings and the proof may be taken advantage of . . . by motion for a nonsuit, and the defendant is not precluded from moving for a nonsuit by reason of his failure to object to the admissibility of the evidence," citing *Elmore* v. *Elmore,* 114 Cal. 516, [46 Pac. 458], and other cases. It must be admitted that the complaint seems to have been framed with a view to a different state of facts from that developed by the evidence.

Appellant states in her brief: "The theory of plaintiff's case is that the furnishing and keeping in repair of the engine was an absolute duty which defendant owed to deceased; that this duty could not be delegated to another; but that if so shifted, that other became a vice-principal, for whose dereliction the master is liable." Support is sought by reference to cases announcing the familiar rule that "it is the positive duty of the master to provide his servants with reasonably safe instrumentalities . . . wherewith to do his work." (26 Cyc. 1097.) It is quite clear that this doctrine has no application in the present case. At the time the accident happened the engine was not being used for the purposes for which it was supplied by the master and Gardstrom was not engaged in any line of duty. The engine was in fact out of use and ordered to the shops for repair and had the accident happened while going to the shops the doctrine of the cases relied on by appellant, as we have seen, would have had no application. (*Chesapeake etc. R. R. Co.* v. *Hennessey,* 96 Fed. 713, [38 C. C. A. 307].) Nor can it be said that engineer West, under the circumstances, stood toward Gardstrom in the relation of vice-principal.

Giving the evidence all the force favorable to plaintiff of which it is reasonably susceptible, as we must under the rule

above stated, we fail to discover that actionable negligence by defendant or its liability for the injury has been shown.

The judgment and order are affirmed.

Lennon, P. J., and Hall, J., concurred.